1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ANYKA HARRIS and BOBBY                     No.  1:18-cv-01135-NONE-SKO
     REEDOM,
12
                    Plaintiffs,
13                                              ORDER GRANTING IN PART AND
            v.                                  DENYING IN PART DEFENDANTS'
14                                              MOTION FOR SUMMARY JUDGMENT
     CITY OF TULARE, et al.,
15
                    Defendants.
16                                              (Doc. No. 33)

17

18

19                              **INTRODUCTION**

20          Plaintiffs Anyka Harris and Bobby Reedom ("plaintiffs") were the mother and father,

21   respectively, of Jontell Reedom ("Jontell").  On March 12, 2018, defendants Clemente Clinton

22   ("Clinton") and Jose Valencia ("Valencia"), who are police officers for defendant City of Tulare

23   (collectively, "defendants"), shot and killed Jontell after responding to a dispatch report that a

24   school-bus driver had been assaulted.  Each plaintiff brought civil-rights actions in this federal

25   court, which were consolidated and merged in this case.  (Doc. No. 12.)  On June 10, 2020,

26   defendants filed a motion for summary judgment, which is now pending before the court.  (Doc.

27   /////

28   /////

                                           1

No. 33.)  For the following reasons, defendants' motion will be granted in part and denied in part.[1]

**BACKGROUND**

**A.     Factual Background**

Unless otherwise noted, the facts set forth below are undisputed by the parties.

  1.   Relevant Aspects of Jontell's History

Jontell had previous contacts with both of the defendant officers.  Within a year before the shooting, while on patrol, officer Clinton responded to a complaint of Jontell causing a disturbance.  (Doc. No. 33-1 ¶¶ 15-18 (Joint Statement of Undisputed Facts, "JS"); Clinton Deposition Transcript at 62:4–21.)[2]  When officer Clinton contacted Jontell, Jontell was aggressive and confrontational, told Clinton he wanted to be left alone, and eventually walked away.  (JS ¶ 17.)  Clinton did not use physical force during that encounter.  (*Id.* ¶ 18.)

Officer Valencia also had one or two prior encounters with Jontell in downtown Tulare.  Jontell had been panhandling and had made patrons of a business uncomfortable.  (*Id.* ¶¶ 20-21.)  Although Jontell was initially uncooperative with officer Valencia each time, he became cooperative after speaking with officer Valencia.  (*Id.* ¶ 23; Valencia Tr. 17:13-25.)  Officer Valencia also had contact with Jontell on April 18, 2009, in connection with a dog taken from a backyard.  (Doc. Nos. 39-1 at 19; 40-4 ¶ 98 (defendants' objections to plaintiff Reedom's

/////

---

[1] The undersigned apologizes for the excessive delay in the issuance of this order.  This court's overwhelming caseload has been well publicized and the long-standing lack of judicial resources in this district long-ago reached crisis proportion.  That situation, which continued unabated for over twenty-two months but has now been partially addressed by the U.S. Senate's confirmation of a new district judge for this court on December 17, 2021, left the undersigned presiding over 1,300 civil cases and criminal matters involving 735 defendants at last count.  Unfortunately, that situation sometimes results in the court not being able to issue orders in submitted civil matters within an acceptable period of time.  This situation has been frustrating to the court, which fully realizes how incredibly frustrating it is to the parties and their counsel.

[2] Defendants and plaintiff Harris have filed different selections of the deposition transcripts of defendants Clinton and Valencia in connection with the pending motion.  (*See* Doc. Nos. 33-4 (Clinton deposition); 33-5 (Valencia deposition); 34-1 (Clinton deposition); 35-2 (Valencia deposition); 40-2 (Clinton deposition); 40-3 (Valencia deposition)).  When citing these transcripts the court will refer to "Clinton Tr." or "Valencia Tr."

1  Separate Genuine Disputes of Fact, "PRDF").)[3]

2          Jontell had numerous other contacts with Tulare police officers.  Indeed, plaintiff Reedom

3  points to at least 53 other encounters Jontell had with the police, but it is unknown to what extent

4  officers Clinton or Valencia were aware of these incidents.  (PRDF ¶ 97.)

5          Plaintiff Reedom contends that Jontell had been prescribed olanzapine (brand name

6  Zyprexa) to treat his schizophrenia.  (PRDF ¶¶ 101, 105.)  Defendants do not dispute that Jontell

7  was treated with that medicine for schizophrenia.  According to plaintiff Reedom, Clinton and

8  Valencia were on notice of these facts.  Plaintiff Reedom points to exhibit E of Edward Lyman's

9  declaration, which are excerpts from Tulare police department reports.  At times, plaintiff

10  Reedom points to 54 pages of the reports; at other times, plaintiff Reedom points to several

11  specific pages.  (PRDF ¶¶ 101–105.)  The cited pages do reflect that certain members of the

12  Tulare Police Department were aware that Jontell had been prescribed psychiatric medications

13  before his death.  Once, for example, plaintiff Harris gave Tulare police officers Jontell's

14  prescription medicine.  (PRDF ¶ 104.)  However, the record before the court on summary

15  judgment does not establish that officers Clinton or Valencia were aware of Jontell's mental

16  illness or of the medication he was prescribed to treat his condition.  (Doc. No. 39-1 at 10–11,

17  30.)

18          2.  Initial Encounter

19          On March 12, 2018, police dispatch relayed to officers, including officers Clinton and

20  Valencia, a report that an individual had just assaulted a school-bus driver.  (JS ¶¶ 1–2, 5.)  The

21  dispatcher did not provide any information about whether the suspect was armed or whether

22  anyone had been injured but did inform the officers that the suspect—later identified as Jontell—

23  /////

24

25  [3]  Defendants argue that the court should disregard plaintiff Reedom's statement of disputed facts
    due to untimeliness.  (Doc. No 40-4 at 1–2.)  It is the case that plaintiff Reedom did not file his
26  statement of disputed facts until the day defendants' reply in support of their motion for summary
    judgment was due.  (*See* Doc. Nos. 38 & 39.)  The court need not resolve any dispute over the
27  timeliness of Reedom's filing, however, because it finds that plaintiff Reedom's statement of
    disputed facts does not impact the resolution of the pending motion.  The court includes several of
28  those facts in this section of its order only for purposes of providing adequate background.

1    was leaving the area on foot.  (JS ¶¶ 24–25.)[4]

2          Officer Clinton responded to the scene first.  (JS ¶ 2.)  Upon arrival he saw Jontell from

3    his police car near the intersection of East Cross Avenue and Auburn Street but did not see any

4    weapons, nor did he witness Jontell commit a crime.  (JS ¶ 26; Clinton Tr. 18:5–17.)  Clinton

5    exited his vehicle and tried to speak with Jontell.  (*Id.* 18:18–25.)  Jontell replied, "fuck you, I

6    don't even know if you're a real cop" and then stated to officer Clinton that he thought Clinton

7    had slept with his girlfriend.  (JS ¶¶ 2, 27-28.)  Jontell also told officer Clinton " 'Don't touch me'

8    or words to that effect" and walked away.  (JS ¶¶ 3, 29; Clinton Tr. 30:18-24.)

9          3.   First Tasing and Beginning of the Fight

10         After Jontell walked away, officer Clinton ordered him to come back:

11               Q.  What type of commands were you giving him when he was
12               walking away from you?

               A.  I was telling him to stop, come here.  He wasn't free to leave.  I
13               was trying to figure out what was going on.

14               Q.  And that would have been as he was walking away from you, as
               you described?
15
               A.  Yes.
16

17   (Clinton Tr. 33:17–24.)  Jontell eventually stopped and turned back toward officer Clinton.  (JS

18   ¶ 32.)  A few seconds later, officer Clinton then deployed his taser on Jontell in probe/dart mode.

19   (*Id.*; Clinton Tr. 33:25–34:8.)  Officer Clinton estimated that Jontell was four feet away when he

20   tased him.  (*Id*. 34:9–11.)  Officer Clinton stated in a post-incident interview that Jontell's fists

21   were closed when he was tased.  (JS ¶ 32; Doc. No 33-10.)[5]  This tasing did not incapacitate

22   Jontell, and he began punching officer Clinton.  (JS ¶ 4.)

23

24   _____

     [4]  Defendants contend that officers had been told that Jontell "had punched an innocent school
25   bus driver" (JS ¶ 24); the evidence defendants cite does not establish whether the driver had been
     injured, (*id.* ¶ 1; Doc. No. 33-3 at 2–3).
26

27   [5]  It is not clear who interviewed officer Clinton, and there are no indications that this statement
     was given, for instance, under penalty of perjury.  (*See* Doc. Nos. 33-2 at 3 (defense counsel's
28   declaration describing relevant exhibit as "true and correct excerpts from the post-incident
     interview of Officer Clinton."); 33-10 (not explaining context).)

Parts of what happened next are visible on a 60-second dashcam video taken by a civilian driver which has been submitted to the court as evidence on summary judgment. (Doc. No. 33-5 ("Dashcam").) The Dashcam first captures aspects of the police encounter with Jontell 27 seconds into the recording. At that point, two figures come into view on a sidewalk in the distance. One person in a white shirt (Jontell) and another in a black shirt (Clinton) are seen moving around. Based upon the court's review of the Dashcam video it is not clear what is taking place at this point of the recording. As the Dashcam gets closer to the action, the altercation becomes clearer. At 31 seconds in, the video shows Jontell and officer Clinton fighting. At 32 seconds in, Clinton falls to the ground, presumably due to the fight, and Jontell continues to punch him. At 37 seconds in, Jontell stops punching Clinton and can be seen standing above him.[6]

Officer Clinton then pushed Jontell back using his feet to do so, Jontell walked away, and Clinton stood back up. (JS ¶¶ 36–37; Clinton Tr. 35:4–36:14.) Officer Clinton then called for expedited backup and followed Jontell. (JS ¶¶ 38–39; Clinton Tr. 36:14–16.)

### 4. Officer Valencia Arrives and Tases Jontell Twice

Officer Valencia arrived on the scene at approximately this point and saw Jontell walking along East Cross Avenue towards Cherry Street. (JS ¶ 40.) Jontell walked towards officer Valencia, who said "Jontell, stop." (*Id.* ¶ 42.) After Jontell replied, "I'm not stopping," and Valencia then tased him without giving any further warning. (*Id.* ¶¶ 5, 42, 44.) Jontell ran away after officer Valencia's first tasing, and Valencia chased after him. (*Id.* ¶ 48.)

This part of the altercation was also captured on a video which has also been submitted to the court on summary judgment. (Doc. No. 33-8 ("Handheld Video")). The Handheld Video appears to have been taken by bystanders from a car, most likely with a cell phone. It begins with a noise that could be the sound of a taser. One officer—apparently officer Clinton—is visible near a police car. Jontell and the other officer—apparently officer Valencia—are obscured by a bush. At three seconds into the video, however, Jontell can be seen running away. At eight seconds in, there is a popping sound while officer Valencia is seen with his arm outstretched. It is

---

[6] The remainder of this video is irrelevant to resolution of the pending motion.

undisputed that this was the second time officer Valencia tased Jontell.  (JS ¶ 49.)  Jontell then is

seen continuing to run away, and officer Valencia chases him.  (Handheld Video at 0:09–15;

JS ¶ 52.)  Jontell stopped running and Valencia is seen catching up to him.  (Handheld Video at

0:17.)  At this point in the video, Valencia "drive-stunned [Jontell] with his Taser," and the two

began punching each other.  (JS ¶¶ 8, 53–54, 57; Handheld Video at 0:17–23.)

### 5.  Valencia's Baton

The Handheld Video next shows Jontell and officer Valencia each taking a few steps back

from one another after exchanging more punches.  (Handheld Video at 0:19–20.)  At 22 seconds

into the Handheld Video, Valencia retrieves his baton and begins to advance toward Jontell.

(*Accord* JS ¶ 57.)  Valencia is then seen swinging the baton at Jontell.  (Handheld Video at 0:23–

25.)  The parties dispute, however, whether officer Valencia hit Jontell with the baton.  (*See*

JS ¶¶ 9, 61.)  Valencia testified that he missed.  (Valencia Tr. 28:7–12.)  The Handheld Video

does not clearly establish whether he did in fact hit Jontell.  (Handheld Video at 0:21–24.)

However, the parties do not dispute that according to the autopsy report, Jontell's body also

showed "four distinctly colored dots to his right upper chest and three linear dots to the lower

right abdomen that could be consistent with taser marks" and that he also "sustained an elongate 2

1/8 inch abrasion to his mid abdomen consistent with a baton strike mark."  (JS ¶¶ 94–95.)

Officer Clinton is next seen on the video catching up to the other two and deploying

pepper spray at Jontell.  (Handheld Video at 0:25–31; JS ¶¶ 10, 64.)  After he sprayed Jontell,

officer Clinton put his hand to his own face and walked away.  (Handheld Video at 0:31–33.)

Meanwhile, officer Valencia swung his baton again; the parties again dispute whether he hit

Jontell at this time.  (*Id.*; JS ¶¶ 11, 68.)[7]

After one of officer Valencia's swings, Jontell took the baton from him.  (JS ¶¶ 12, 76;

Clinton Tr. 42:7–15.)  It is unclear from the video how far away Jontell was from officer Valencia

when he took the officer's baton.  (*See* Handheld Video at 0:37–38; JS ¶¶ 76–77.)  Later, officer

---

[7]  Specifically, defendants claim that "Valencia attempted more than one baton strike, but it is clear that only one, if any, may have connected, while all others missed and none subdued [Jontell]."  (JS ¶ 68.)  Plaintiff Harris states that officer Valencia did strike Jontell this time.  (*Id.*)

Valencia told a detective that Jontell was "[f]ive to ten feet [away].  I'm not sure."  (Valencia Tr. 35:9).  Defendants now contend that Jontell was "within arm's reach when he took Valencia's baton."  (JS ¶ 76.)  Either way, it is undisputed that officer Valencia stepped back after Jontell took his baton.  (JS ¶ 78.)

### 6.   The Shooting

The parties' account of the actual shooting differs substantially.  According to defendants, Jontell advanced on officers Clinton and Valencia after taking Valencia's baton.  (JS ¶ 13.)  Under this account, Jontell then "raised [the baton] above his head and was making a forward motion as if he was going to strike [officer Valencia] with it."  (Valencia Tr. 33:23–24.)  Before Jontell was able to swing the baton, officers Clinton and Valencia shot him.  (JS ¶ 13.)  Officer Valencia estimated that Jontell was "[f]ive to seven feet" away from him when he first fired his gun.  (Valencia Tr. 36:19–24.)  Officer Clinton testified that he was "[a]pproximately eight to ten feet" away from Jontell when he fired his first shot.  (Clinton Tr. 43:16.)  According to officer Valencia, Jontell "was still coming forward with the baton raised" after their first shots were fired.  (Valencia Tr. 38:15–16.)

Plaintiffs paint a very different picture of the evidence on summary judgment.  Plaintiff Harris argues that Jontell "was moving away from Officer Valencia and did not raise the baton in a threatening manner prior to the shooting."  (Doc. No. 36 at 26.)  Plaintiff Reedom argues that after Jontell "took the baton, he moved back and away from Officer Valencia."  (Doc. No. 37 at 11.)  The parties do agree, however, that defendants did not warn Jontell they would shoot him before they fired.  (JS ¶ 81.)  Ultimately officer Clinton fired seven shots; officer Valencia fired twice.  (JS ¶ 79.)  All nine shots hit Jontell, and he died as a result.  (JS ¶ 93.)

The Handheld Video before the court provides some additional context.  At 35 seconds into that video, a car begins to obscure the video's view, just as Jontell grabbed officer Valencia's baton.  At 38 seconds in, the car finishes passing in front of the camera.  At that point, Jontell's white shirt and black pants are visible but out of focus.  The video does not depict whether Jontell's hands were above his head or where the baton was.  Based on the court's review of the

/////

7

evidence on summary judgment, the video does not provide support for either party's version of the events.

At almost the exact same time as Jontell becomes visible on the video, the first gunshot is audible. More gunshots were fired as Jontell fell to the ground within one second of the first gunshot. Again, the video submitted to the court does not clearly establish whether Jontell's arms were raised between the first shot and his falling to the ground. However, it does not appear on the video that Jontell continued to move forward after the first gunshot was fired. (*Id.*) Finally, the video depicts that after Jontell fell to the ground, officers Clinton and Valencia continued to shoot him. (*Id.* at 0:39-40.)

### 7. Expert Opinion

Plaintiff Harris filed the expert declaration of Roger Clark in opposition to the pending motion for summary judgment, who opines that the deadly force employed in this case by the officers was unreasonable, stating:

> A reasonable officer in the officers' position would not have believed that they were being confronted with an immediate defense of life situation, as Mr. Reedom never swung the baton at the officers or anyone and appeared to be backing away after he took the baton. The officers had less-than-lethal alternatives to take Mr. Reedom into custody, including creating distance, giving additional commands to Mr. Reedom to drop the baton, giving a verbal warning that deadly force was going to be used, using less-than-lethal force, and waiting for backup to arrive to assist in the arrest. Officers are trained that they cannot shoot someone for simply having a wood or metal weapon, knife, or gun in their hand. Officers are trained that being in a physical altercation alone is not sufficient justification for the use of deadly force.

(Doc. No. 34-5 ¶ 18.)

### B.    Procedural Background

Plaintiff Anyka Harris filed a complaint against defendants City of Tulare and Does 1-10 on August 22, 2018, asserting claims under 42 U.S.C. § 1983 ("§ 1983") and state law. (Doc. No. 1.) Plaintiff Bobby Reedom also filed a complaint in this district against defendant City of Tulare and Does 1-10 on October 3, 2018. (Case No. 1:18-cv-01366-LJO-SKO, Doc. No. 1.) As indicated above, the two actions were consolidated and merged on December 21, 2018. (Doc. No. 12.)

Plaintiffs filed a combined first amended complaint on August 2, 2019 against defendants City of Tulare, Clinton, Valencia, and Does 3-10.  (Doc. No. 28.)  The complaint's federal claims under § 1983 were for excessive use of force in violation of the Fourth Amendment, violations of substantive due process, and various municipal-liability claims.  (*Id.*)  The complaint also included state law tort claims for battery and negligence and a claim brought under California's Bane Act.  (*Id.*)

Defendants moved for summary judgment on June 10, 2020, (Doc. No. 33), and plaintiff Harris filed a declaration containing evidence in support of her opposition to that motion for summary judgment, (Doc. No. 34).  Both plaintiffs filed oppositions to defendants' motion on June 26, 2020.  (Doc. Nos. 36 & 37.)  On July 2, 2020, plaintiff Reedom filed a separate statement of disputed issues of material fact and additional material facts, along with a declaration that included evidence in support of plaintiffs' opposition.  (Doc. Nos. 38 & 39.)  The same day, defendants filed a reply.  (Doc. No. 40.)

On May 18, 2021, the court noted that defense counsel's declaration indicated that plaintiff Harris had agreed to voluntarily dismiss with prejudice the municipal-liability claims. The court ordered the parties to file an appropriate dismissal document reflecting that agreement. (Doc. No. 56.)  On May 19, 2021, the parties filed a stipulation of dismissal of the third, fourth, and fifth causes of action from the first amended complaint as to both plaintiffs.  (Doc. No. 57.) In light of the stipulated dismissal, the municipal liability claims are no longer before the court.

**LEGAL STANDARDS**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party "initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Where, as here, the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325).  If the moving party meets its initial burden, it shifts to the opposing party to

1   establish that a genuine dispute over a material fact actually exists.  *See Matsushita Elec. Indus.*
2   *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

3          To meet their burden, the parties may not simply rest on their pleadings.  Rather, parties
4   must cite to specific parts of the record to show whether there is a genuine dispute over a material
5   fact.  *See* Fed. R. Civ. P. 56(c); *see also Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th
6   Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for
7   summary judgment.").  A fact is material if it might affect the outcome of the suit under
8   governing law, and the dispute, genuine if a reasonable jury could return a verdict for the non-
9   moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

10         Although the court takes undisputed facts as true and draws all inferences supported by
11  the evidence in favor of the non-moving party, *see Anthoine v. N. Cent. Counties Consortium*,
12  605 F.3d 740, 745 (9th Cir. 2010), the party opposing summary judgment "must do more than
13  simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475
14  U.S. at 587 (citation omitted).  However, the non-moving party need not establish a material issue
15  of fact conclusively in its favor.  It is enough that "sufficient evidence supporting the claimed
16  factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the
17  truth at trial."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th
18  Cir. 1987) ("[A]t this [summary judgment] stage of the litigation, the judge does not weigh
19  conflicting evidence with respect to a disputed material fact.  Nor does the judge make credibility
20  determinations with respect to statements made in affidavits, answers to interrogatories,
21  admissions, or depositions.").  "Where the record taken as a whole could not lead a rational trier
22  of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475
23  U.S. at 587 (citation omitted).  Likewise, "a complete failure of proof concerning an essential
24  element of the non-moving party's case necessarily renders all other facts immaterial."  *Celotex*,
25  477 U.S. at 322.

26         When examining police officers' use of deadly force at summary judgment, courts are
27  mindful that the plaintiff has died and thus cannot testify.  Accordingly, in such circumstances
28  courts "carefully examine all the evidence in the record, such as medical reports,

1    contemporaneous statements by the officer and the available physical evidence, to determine

2    whether the officer's story is internally consistent and consistent with other known facts.  [Courts]

3    must also examine circumstantial evidence that, if believed, would tend to discredit the police

4    officer's story."  *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014); *see also Estate*

5    *of Lopez v. Gelhaus*, 871 F.3d 998, 1006, 1008-09 (9th Cir. 2017).  Thus, "[i]n cases where the

6    best (and usually only) witness who could offer direct testimony for the plaintiff about what

7    happened before a shooting has died, [Ninth Circuit] precedent permits the decedent's version of

8    events to be constructed circumstantially from competent expert and physical evidence, as well as

9    from inconsistencies in the testimony of law enforcement."  *George v. Morris*, 736 F.3d 829, 834

10   (9th Cir. 2013).

11           Finally, where there is video evidence of the incident giving rise to an excessive use of

12   force claim, a court must "view[] the facts in the light depicted by the videotape."  *Scott v. Harris*,

13   550 U.S. 372, 380–81 (2007) (explaining that courts should not rely on "such visible fiction" that

14   "is so utterly discredited by the record"); *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th

15   Cir. 2018) ("The record is viewed in light most favorable to the nonmovants . . . , so long as their

16   version of the facts is not blatantly contradicted by the video evidence." (citations omitted)).

17   Nonetheless, even where video evidence exists, reasonable factfinders might be able to draw

18   divergent conclusions from what the video evidence shows.  *See Nehad v. Browder*, 929 F.3d

19   1125, 1132–39 (9th Cir. 2019) (disputed issues of material fact precluded the granting of

20   summary judgment in an action alleging excessive use of force even though the evidence

21   included surveillance footage); *Glenn v. Washington County*, 673 F.3d 864, 878 (9th Cir. 2011)

22   ("The circumstances of this case can be viewed in various ways, and a jury should have the

23   opportunity to assess the reasonableness of the force used after hearing all the evidence."); *see*

24   *also Branscum v. San Ramon Police Dep't*, 606 F. App'x 860, 862 (9th Cir. 2015)[8] (where "the

25   video footage is . . . susceptible to more than one interpretation," a district court may find genuine

26   dispute of material fact).

27   _____

28   [8]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule
     36-3(b).

1           **DISCUSSION**

2      **A.  Qualified Immunity as to Excessive Force**

3           Defendants Clinton and Valencia move for summary judgment in their favor as to

4      plaintiffs' §1983 claims on qualified immunity grounds.  (Doc. No. 33 at 17–20.)  "Public

5      officials are immune from suit under 42 U.S.C. § 1983 unless they have violated a statutory or

6      constitutional right that was clearly established at the time of the challenged conduct."  *City &*

7      *Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 611 (2015).  To defeat qualified

8      immunity on summary judgment, a plaintiff must "[r]aise[] a genuine issue of fact showing (1) a

9      violation of a constitutional right, and (2) that the right was clearly established at the time of the

10     defendant's alleged misconduct."  *Evans v. Skolnik*, 997 F.3d 1060, 1064 (9th Cir. 2021) (quoting

11     *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

12          1.  Whether Defendants Violated the Fourth Amendment

13          Defendants Clinton and Valencia also move for summary judgment on the ground that as

14     a matter of law the deadly force they employed was objectively reasonable.  (Doc. No. 33 at 2.)

15     Plaintiffs allege that officers Clinton and Valencia used excessive force "when they discharged a

16     Taser at [Jontell], punched [Jontell] multiple times, struck [Jontell] with a baton, employed

17     pepper spray at [Jontell], and ultimately shot and killed [Jontell]."  (Doc. No. 28 ¶ 30.)

18     Defendants' argument in moving for summary judgment, however, is tailored to the use of deadly

19     force and does not independently address their preceding use of non-deadly force.  (*See* Doc. No.

20     33 at 14–17.)  The court will therefore confine its analysis to only the issues raised by the moving

21     party and will analyze defendants' use of force only with respect to the deadly force employed.

22          Section 1983 provides a cause of action for the deprivation of "rights, privileges, or

23     immunities secured by the Constitution or laws of the United States" by a person acting "under

24     color of any statute, ordinance, regulation, custom, or usage."  *Gomez v. Toledo*, 446 U.S. 635,

25     639 (1980).  To prevail under § 1983, a plaintiff must prove "(1) that a right secured by the

26     Constitution or laws of the United States was violated, and (2) that the alleged violation was

27     committed by a person acting under the color of State law."  *Long v. Cty. of Los Angeles*, 442

28     F.3d 1178, 1185 (9th Cir. 2006).

                                              12

A claim that a law enforcement officer used excessive force during an arrest is analyzed under the Fourth Amendment's objective reasonableness standard.  *See Graham v. Connor*, 490 U.S. 386, 395 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985).  Under the standard, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.  Fundamental to "*Graham*'s objective-reasonableness test is the clear principle that the force used to make an arrest must be balanced against the need for force:  it is the need for force which is at the heart of the *Graham* factors." *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1025 (9th Cir. 2015); *see also Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1057 (9th Cir. 2003).  Thus, in any such case, the court must balance "the nature of the harm and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010) (quoting *Graham*, 490 U.S. at 396); *see also Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002) ("Force is excessive when it is greater than is reasonable under the circumstances."); *Liston*, 120 F.3d at 976.

This test "calls for a fact-intensive inquiry requiring attention to all circumstances pertinent to the need for the force used." *Velazquez*, 793 F.3d at 1024.  This inquiry considers the possibility that while officers might have been justified in using some force, the amount used might have been excessive. *Santos,* 287 F.3d at 853.  In considering the pending motion for summary judgment, the following admonition of the Ninth Circuit with respect to summary judgment in cases involving claims of excessive use of force must be kept in mind:

> Under the Fourth Amendment, law enforcement may use "objectively reasonable" force to carry out such seizures; as in the unlawful arrest analysis, this objective reasonableness is determined by an assessment of the totality of the circumstances. . . .  Because this inquiry is inherently fact specific, the "determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases."

*Green v. City & Cnty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (citations omitted); *see also Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) ("Because the excessive

1  force inquiry nearly always requires a jury to sift through disputed factual contentions, and to

2  draw inferences therefrom, . . . summary judgment or judgment as a matter of law in excessive

3  force cases should be granted sparingly."); *see also Newmaker v. City of Fortuna*, 842 F.3d 1108,

4  1117 (9th Cir. 2016) ("Because this case requires a jury to sift through disputed factual

5  contentions . . . summary judgment was inappropriate.").

6      "The gravity of the particular intrusion that a given use of force imposes upon an

7  individual's liberty interest is measured with reference to the type and amount of force inflicted."

8  *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011).  The intrusion is balanced

9  against the government's interest in the use of force.  There are three main enumerated factors:

10  "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the

11  safety of the officers or others, and (3) whether the suspect was actively resisting arrest or

12  attempting to evade arrest by flight."  *Id.* at 1163 (citation omitted).  In addition, there is a fourth,

13  catchall factor to be considered in the government-interest analysis:  "any other exigent

14  circumstances that existed at the time of the arrest."  *Deorle v. Rutherford*, 272 F.3d 1272, 1280

15  (9th Cir. 2001) (internal quotation marks and citations omitted).

16      The court now turns to the application of the balancing test to this case based upon the

17  evidence presented on summary judgment.

18          a.     *The Nature of the Harm and the Quality of the Intrusion*

19      The court begins its analysis by assessing both the type and the amount of force used.  *See*

20  *Bryan*, 630 F.3d at 824; *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007).  In this

21  case it is undisputed that deadly force, the highest degree of force, was employed by the

22  defendant officers.  *Blanford v. Sacramento Cnty.*, 406 F.3d 1110, 1115 n.9 (9th Cir. 2005) )

23  (defining "deadly force" as "force creating a substantial risk of causing death or serious bodily

24  injury") (citing *Smith v. City of Hemet*, 394 F.3d 689, 704–07 (9th Cir. 2005) (*en banc*)); *see also*

25  *A. K. H. by & through Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) ("The

26  intrusiveness of a seizure by means of deadly force is unmatched.  The use of deadly force

27  implicates the highest level of Fourth Amendment interests both because the suspect has a

28  fundamental interest in his own life and because such force frustrates the interest of the

1  individual, and of society, in judicial determination of guilt and punishment.") (citations and

2  quotation marks omitted).

3  　　　　　　　　　　　　b.　　*Government Interest in Use of Force*

4  　　　　　Having identified the degree of force used, the court next considers the government's

5  interest in its use.  In analyzing the government's interests at issue, courts must consider a number

6  of factors, including (1) the severity of the crime, (2) whether the suspect posed an immediate

7  threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or

8  attempted to evade arrest by flight, and any other exigent circumstances.  *Estate of Diaz v. City of*

9  *Anaheim*, 840 F.3d 592, 605 (9th Cir. 2016); *Glenn*, 673 F.3d at 872; *Mattos v. Agarano*, 661

10  F.3d 433, 441 (9th Cir. 2011) (*en banc*); *Deorle*, 272 F.3d at 1280.  Courts may also consider,

11  when appropriate, whether a warning was given before force was used.  *See Deorle*, 272 F.3d at

12  1283–84 ("[W]arnings should be given, when feasible, if the use of force may result in serious

13  injury, and . . . the giving of a warning or the failure to do so is a factor to be considered in

14  applying the *Graham* balancing test.").  In addition, the court must "examine the totality of the

15  circumstances and consider whatever specific factors may be appropriate in a particular case,

16  whether or not listed in *Graham*."  *Hughes v. Kisela*, 862 F.3d 775, 779 (9th Cir. 2016) (internal

17  citation and quotation marks omitted), *rev'd on other grounds*, ___U.S.___, 138 S. Ct. 1148

18  (2018); *Mattos*, 661 F.3d at 441. Ultimately, in considering this factor, "[t]he most important

19  factor, however, is whether [the suspect] posed an immediate threat to the safety of officers or

20  others."  *Vos*, 892 F.3d at 1031–32.

21  　　　　　　　　　　　i.　　　　Severity of the Crime at Issue

22  　　　　　The court is next to consider the severity of the crime at issue.  *Graham*, 490 U.S. at 396;

23  *A. K. H.*, 837 F.3d at 1011; *Deorle*, 272 F.3d at 1280–81.  Initially, in this case officers Clinton

24  and Valencia were responding to a reported assault and battery.  Later in the encounter, Jontell

25  fought the officers, which may have constituted a different crime.  Plaintiffs argue that the court

26  should consider the initial crime when determining the severity of the crime for Fourth

27  Amendment purposes.  (Doc. No. 36 at 20-21.)  Defendants disagree and contend the proper

28  question is the crime at issue when the deadly force was applied by officers.  (Doc. No. 40 at 16.)

The Ninth Circuit has acknowledged it has not consistently applied this factor. *Nehad v. Browder*, 929 F.3d 1125, 1136 (9th Cir. 2019).  One approach is to employ the felony/misdemeanor dichotomy.  Under that approach, "a particular use of force would be more reasonable, all other things being equal, when applied against a felony suspect than when applied against a person suspected of only a misdemeanor." *Id.*  Here, Jontell was initially suspected of committing an assault[9] and later fought with police officers, grabbing away one of their batons.  Certainly the latter conduct could be prosecuted as a felony under California law.  *See* Cal. Penal Code §§ 17 (defining felonies), 243(c)(2) (batteries against officers in the performance of their duties).

Under the other approach, courts "have used the severity of the crime at issue as a proxy for the danger a suspect poses at the time force is applied." *Nehad*, 929 F.3d at 1136.  Under this approach, for instance, even when a "suspect had physically assaulted his wife but was standing alone on his porch when the officers arrived, the nature of the crime at issue provided little, if any, basis for the use of force." *Id.* (citing *Smith*, 394 F.3d at 702–03).  Using this second approach, Jontell's conduct at the time the force at issue was used against him—fighting police officers—would favor permitting police officers to employ a greater degree of force in response.  However, in *Nehad* the Ninth Circuit found it unnecessary to decide which approach should be adopted in considering this factor.  *See* 929 F.3d at 1136.

Such is the case here as well and it is unnecessary for the court to resolve which approach is appropriately applied.  As will become apparent below, whether this factor is framed as involving investigation of a felony offense for fighting police officers or a misdemeanor battery against the bus driver, the court's final analysis and conclusion are the same.  This is because consideration of the immediate-threat factor far outweighs the severity-of-the-crime factor in light of the evidence on summary judgment.

/////

---

[9]  Under California law assault and battery are misdemeanor offenses.  Pen. Code §§ 240, 242, 243(a).  However a battery involving the infliction of serious bodily injury is a felony offense.  Pen. Code, §§ 242, 243(d).

ii.      Immediate Threat to Safety of Officers or Others

As noted above, whether there was an immediate threat to safety of officers or others is the most important factor to consider in situations involving the use of deadly force by police. *Vos*, 892 F.3d at 1031–32; *A. K. H.*, 837 F.3d at 1011; *see also Bryan*, 630 F.3d at 826; *Smith*, 394 F.3d at 702.  "In deadly force cases, where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."  *Glenn v. Washington Cnty.*, 673 F.3d 864, 879 (9th Cir. 2011). Similarly, "[a] desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury. There must be other significant circumstances that warrant the use of such a degree of force at the time it is used."  *Deorle*, 272 F.3d at 1281.  Nonetheless, "where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force."  *Smith*, 394 F.3d at 704.  Deadly force may also be appropriately used by an officer being beaten with a baton. *But see Hopkins v. Andaya*, 958 F.2d 881, 883–84, 887 (9th Cir. 1992) (where an officer claimed that he feared for his life because the suspect was beating the officer with his own baton, the use of deadly force was not justified when the suspect no longer wielded the baton because "[t]he baton—the one that had caused Andaya to fear for his life—was gone."), *overruled on other grounds as stated in Federman v. Cnty. of Kern*, 61 F. App'x 438, 440 (9th Cir. 2003).[10]

The Ninth Circuit has also cautioned that

> a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern.  In short, an officer's use of force must be objectively reasonable based on his contemporaneous knowledge of the facts.

*Deorle*, 272 F.3dat 1281.  "If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *George*, 736 F.3d at 838.  "This balance must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Boyd v. Benton Cty.*, 374

---

[10]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

1   F.3d 773, 779 (9th Cir. 2004) (citing *Graham*, 490 U.S. at 396).  Nonetheless, it has long been

2   established "that the fact that the 'suspect was armed with a deadly weapon' does *not* render the

3   officers' response *per se* reasonable under the Fourth Amendment."  *George*, 736 F.3d at 838

4   (emphasis in original) (quoting *Glenn*, 673 F.3d at 872–73); *see also Harris v. Roderick*, 126 F.3d

5   1189, 1204 (9th Cir. 1997) ("Law enforcement officials may not kill suspects who do not pose an

6   immediate threat to their safety or to the safety of others simply because they are armed.");

7   *Curnow v. Ridgecrest Police*, 952 F.2d 321, 323, 325 (9th Cir. 1991) (holding that use of deadly

8   force was unreasonable where, according to the plaintiff's version of facts, the decedent

9   possessed a gun but was not pointing it at the officers and was not facing the officers when they

10   shot him).

11       Here, it is disputed on summary judgment what took place immediately after Jontell

12   seized officer Valencia's baton.  The court must view the evidence in the light most favorable to

13   plaintiffs as the non-movants.  *See Vos*, 892 F.3d 1028.  Moreover, as recognized above, because

14   Jontell is deceased and cannot testify, the court must also "carefully examine all the evidence in

15   the record . . . to determine whether [each] officer's story is internally consistent and consistent

16   with other known facts."  *Gonzalez*, 747 F.3d at 795.  In addition, the court must consider the

17   videotape evidence submitted on summary judgment and "view[] the facts in the light depicted by

18   the videotape."  *Scott*, 550 U.S. at 380.  Thus, even though video evidence exists, the

19   circumstances may be such that reasonable factfinders could draw divergent conclusions from

20   what that video evidence depicts.  *See Nehad*, 929 F.3d at 1132–39 (disputed issues of material

21   fact precluded summary judgment in an action alleging excessive use of force even though the

22   evidence on summary judgment included surveillance footage).

23       Having reviewed all of the evidence submitted on summary judgment, the undersigned

24   concludes that a reasonable jury could conclude that the Handheld Video shows that Jontell was

25   not holding the baton above his head when officers Clinton and Valencia shot him.  (*See*

26   Handheld Video at 0:34–39.)  The evidence before the court does not establish that Jontell's arms

27   were raised when the first shots were fired.  For instance, his white shirt does not appear to go up

28   as one might reasonably expect if he were brandishing a baton above his head.  Thus, a

1   reasonable jury might view the video evidence and conclude, as plaintiffs argue, that it shows

2   Jontell was not brandishing the baton at all.

3        Plaintiff Harris also argues that the video evidence is in fact inconsistent with defendants'

4   deposition testimony.  (Doc. No. 36 at 18.)  For instance, officer Valencia testified that after he

5   shot the first time, Jontell "was still coming forward with the baton raised."  (Valencia Tr. 38:15–

6   16.)  The court concludes that from the evidence submitted, a reasonable jury could find that such

7   testimony is inconsistent with the Handheld Video.  A jury could conclude instead that the video

8   evidence shows that Jontell did not move forward after the first shot was fired by officers and

9   instead dropped directly to the ground.  (*See* Handheld Video 0:38.)  If the jury were to so

10  conclude, it could also find that Jontell grabbed officer Valencia's baton to defend himself and

11  that he thereafter moved away from the officers, thus posing even less of a threat to them.

12       The question becomes, then, whether a reasonable jury would have to conclude Jontell

13  posed an immediate threat to the safety of the officers or others when he was shot and killed.  The

14  evidence on summary judgment, viewed in the light most favorable to plaintiffs, can be

15  summarized as follows.  Jontell had been involved in a physical fight with the officers and was

16  evading them on a city street with cars nearby.  Officers Clinton and Valencia had tried other

17  methods of subduing Jontell.  Jontell had taken officer Valencia's baton and was moving away

18  from the officers when officers Clinton and Valencia shot and killed him.  Jontell was not

19  brandishing the baton above his head when shot.

20       Plaintiff Harris points to Clark's expert opinion to argue that the amount of force

21  employed here was unreasonable.  (Doc. No. 36 at 25–27.)  Clark opines that Jontell did not pose

22  an immediate threat.  (Doc. No. 34-5 ¶¶ 18–19.)  Clark reasons that backup had been called by the

23  officers, that Jontell never swung the baton, that Jontell appeared to be backing up after taking

24  officer Valencia's baton from him, that Jontell was never given a warning that lethal force would

25  be used against him, and that officers Clinton and Valencia had other less-than-lethal options that

26  they should have employed to address the situation.  (*Id.*)

27       Citing to the decision in *Sheehan*, defendants argue that plaintiffs improperly rely on this

28  expert opinion in an attempt to defeat summary judgment.  (Doc. No. 33 at 8; JS ¶ 88.)  In

19

*Sheehan*, the Supreme Court held that "so long as a reasonable officer could have believed that his conduct was justified, a plaintiff cannot avoid summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless."  575 U.S. at 616.  The Supreme Court's statement in this regard was made in connection with consideration of the second step of the qualified-immunity analysis, *i.e.*, whether the violated right was clearly established at the time.  In fact, the language quoted by defendants here tracks parts of the Court's second step's analysis in discussing what a *reasonable officer* could have believed under the circumstances.  Defendants' reliance on the decision in *Sheehan* is therefore misplaced here.  Nothing in that decision prohibits this court from considering Clark's expert opinion on summary judgment as to the issue of whether the deadly force used by police in this case was excessive.

The decision of another judge of this court in *Estate of Casillas v. City of Fresno*, 342 F. Supp. 3d 990 (E.D. Cal. 2018), provides a helpful comparison.  In that case, Casillas fled on foot to evade arrest for a traffic offense.  342 F. Supp. 3d at 993.  The police officers eventually located him as he walked out of an apartment carrying a pipe.  *Id.* at 997.  One officer claimed that Casillas was about five feet from the officer and "quickly moved toward him, raising the pipe to his chest in a pre-assaultive motion."  *Id.*  Stating later that he believed he might be hit in the head with the pipe, the officer shot and killed Casillas.  *Id.*  However, pointing to factual discrepancies in the officer's version of the events, the district court found that a reasonable jury could disbelieve the officer's self-serving version of events.  *Id.* at 998–99.  The plaintiff had proffered expert testimony that the officer had alternative means of subduing Casillas and had no reason to use deadly force.  *Id.* at 999.  With that in mind, the district court concluded that given the evidence before it on summary judgment, a reasonable finder of fact could determine that Casillas did not pose an immediate threat to the officer when shot.  *Id.*[11]

/////

---

[11]  The jury in that case later unanimously determined that Casillas had not posed an immediate threat to the officer at the time of the shooting and that the officer use of deadly force was excessive in violation of the constitution.  (*Casillas*, No. 1:16-cv-01042-AWI-SAB, Doc. No. 88.)

1    Likewise, here, viewing the evidence on summary judgment most favorably to plaintiffs,

2  Jontell was not holding the baton over his head at the time of the shooting.  The undersigned

3  notes that in *Casillas*, the defendants contended the decedent was five feet away from the officer

4  at the time of shooting.  Here, officer Valencia has testified that Jontell might have been farther

5  away from him than that:

6        Q. Towards the top [of a statement] it looks like Detective Ramos is
         asking when he took the baton away from you, what the distance was.
7        You say, "Five to ten feet. I'm not sure."  Ramos says, "Five to ten
         feet."  You say, "Yeah."  Do you see that portion of your statement?
8
9        A.  I see it.

         Q.  After you – after he took the baton from you, did you step back
10       at all before you fired?

11       A.  Yes.

12       Q.  How far did you step back?

13       A.  I took maybe a step or two.

14  (Valencia Dep. at 35:6–18.)

15    Defendants contend this portion of officer Valencia's deposition testimony is misleading

16  and that in fact Jontell "had advanced to within 7–10 feet of Officer Clinton when the first shot

17  was fired" and was still coming toward him after Clinton started shooting.  (Doc. No. 40 at 8–9.)

18  Regardless, this distance is still at least as much as the five feet of separation the defendants

19  claimed in *Casillas* where summary judgment was denied and a jury ultimately determined the

20  use of deadly force to be excessive and in violation of the constitution.[12]

21    Viewing the facts in the light most favorable to plaintiffs, and in light of Clark's

22  declaration, the court finds that a reasonable jury could conclude that Jontell was no more

23  _____

24  [12]  The circumstances presented in *Casillas* were arguably distinguishable from those in this case
     in some respects, yet ultimately those distinctions are not material.  First, while Jontell was
25  actively fighting the officers shortly before he was shot, Casillas was not.  Second, the officers in
     Casillas had not employed other means to attempt to subdue the suspect before shooting him.  At
26  first glance, these facts might make Jontell seem more threatening to a reasonable officer, but
     Casillas' subsequent conduct changes this calculus to some degree.  Casillas went into a building
27  as the police were searching for him and came out brandishing a metal pipe, certainly suggesting
     his intent to cause harm.  In contrast, a reasonable jury could conclude that Jontell's repeatedly
28  evading officer Valencia and Clinton indicated his intent not to keep fighting them.

21

1   threatening than Casillas was.  As such, the court finds that a reasonable jury could conclude from

2   the evidence that Jontell did not pose an immediate threat to the officers or others.

3                                    iii.         Resisting or Evading Arrest

4          The final enumerated *Graham* factor that plays a part in the court's evaluation of the

5   government's interest at stake is whether the suspect was actively resisting arrest or attempting to

6   evade arrest by flight.  *Deorle*, 272 F.3d at 1280.  There is no doubt Jontell was not permitting the

7   defendant officers to arrest him at the time of the shooting, and plaintiff Harris concedes that

8   Jontell resisted arrest.  (Doc. No. 36 at 22.)  Plaintiff Harris, however, does argue that Jontell's

9   resistance was lawful because a reasonable jury could determine that plaintiff was not fleeing but

10  rather avoiding the officers' use of excessive force.  In support of this argument, plaintiff cites to

11  the Ninth Circuit's decision in *Young*, 655 F.3d at 1164, for the proposition that "an officer's

12  provocative conduct can trigger an individual's limited right to offer reasonable resistance."  In

13  this regard, the Ninth Circuit has explained that

14              a person has the limited right to offer reasonable resistance to an
                arrest that is the product of an officer's personal frolic.  That right is
15              not triggered by the absence of probable cause, but rather by the
                officer's bad faith or provocative conduct.  Thus, we must ask
16              whether a reasonable jury could conclude, viewing the evidence in
                the light most favorable to Blankenhorn, that the Defendant officers
17              acted in bad faith or engaged in provocative conduct when arresting
                him.   If so, and Blankenhorn's resistance was reasonable, a
18              constitutional violation occurred.

19  *Blankenhorn v. City of Orange*, 485 F.3d 463, 479 (9th Cir. 2007) (internal quotation marks and

20  citations omitted).

21         However, the cases in which courts have found that a suspect acted within this limited

22  right to offer reasonable resistance have all involved suspects who used less force in resisting than

23  Jontell did here.  For instance, in *Young*, the only such case to which plaintiffs cite in support of

24  their argument in this regard, the suspect had not actively fought any officers.  655 F.3d at 1164.

25  Rather, the suspect may have moved or circled around the officer.  *Id.*  As the court there

26  observed, the suspect's "disobedience of a police officer t[oo]k the form of passive

27  noncompliance that create[d] a minimal disturbance and indicate[d] no threat, immediate or

28  otherwise, to the officer or others."  *Id.* at 1165.  The Ninth Circuit concluded that if a jury were

                                                    22

1   to find that the suspect moved or circled around the officer, it could also conclude that his actions

2   were "simply a reasonable response from an individual who was pepper sprayed from behind

3   without warning while sitting on the sidewalk." *Id.* at 1164.  In contrast, here, it is undisputed on

4   summary judgment that Jontell essentially engaged in a fistfight with the officers.

5        Other cases in which courts have concluded that individuals were acting within their

6   limited right to offer reasonable resistance are distinguishable on similar grounds.  *See, e.g.*,

7   *Blankenhorn*, 485 F.3d at 479–80 (an individual acted within his limited right when he struggled

8   with officers for several seconds after being gang-tackled by surprise; he did not strike any officer

9   or bystanders; rather, he merely tried to stay on his feet while being wrestled); *Garlick v. Cnty. of

10  Kern*, 167 F. Supp. 3d 1117, 1128, 1148 (E.D. Cal. 2016) (the decedent acted within limited right

11  to offer reasonable resistance by moving away from officers and briefly attempted to get a police

12  dog to stop biting him but without striking officers); *Gonzalez v. City of El Monte*, No. 2:18-CV-

13  02346-ODW-GJSX, 2019 WL 4918095, at *7 (C.D. Cal. Oct. 4, 2019) (concluding that a

14  reasonable jury could determine that the plaintiff was acting within his limited right to resist; even

15  assuming he stiffened his muscles in anticipation of punches and tucked his hands beneath his

16  body, since "there is no allegation that Plaintiff struck or attempted to strike either officer").

17  *Young* and its progeny are therefore not on point given the undisputed evidence on summary

18  judgment in this case.

19       As a result, because it is undisputed that Jontell was offering more resistance than

20  permitted under any limited right he had to offer reasonable resistance to the officer's commands,

21  consideration of this factor favors defendants argument that their use of force was reasonable.

22                          iv.        Other Relevant Factors

23       Plaintiffs point to other factors that they argue favor a finding that the deadly force used in

24  this case was excessive.  First, it is undisputed that officers Clinton and Valencia did not warn

25  Jontell before using various types of force—including before shooting him.  (Doc. No. 36 at 22–

26  23 (argument); JS ¶¶ 42, 44, 81.)  "A jury could consider [defendants'] failure to provide such a

27  warning as evidence of objective unreasonableness." *Nehad*, 929 F.3d at 1138.  Thus,

28  consideration of this factor weighs in favor of a finding that defendants acted unreasonably.

Second, plaintiffs contend that the officers knew, or should have known, that Jontell was mentally ill.  (Doc. Nos. 36 at 8–9, 21; 37 at 9–11.)  "Even when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual."  *Glenn v. Washington Cty.*, 673 F.3d 864, 876 (9th Cir. 2011) (internal quotation marks and citations omitted).  Plaintiffs point to evidence of Jontell's erratic behavior at the beginning of the encounter and the officers' previous experience with him, such as Jontell's accusing officer Clinton of sleeping with his girlfriend and his expressing doubt that officer Clinton was "a real cop."  (Doc. No. 36 at 21.)  For similar reasons, plaintiffs' expert Clark opines that "a reasonable officer in Officer Clinton and Officer Valencia's positions would have recognized that Mr. Reedom was mentally ill or suffering from a mental crisis."  (Doc. No. 34-5 ¶ 10.)

Defendants argue that officers Clinton and Valencia believed Jontell was under the influence, not mentally disturbed, and that they had no notice that he suffered from mental illness. (Doc. Nos. 33 at 9; 40 at 10.)  However, the relevant analysis of this factor is objective, not subjective.  *Young*, 655 F.3d at 1161 ("The reasonableness of a seizure turns on whether officers' actions are objectively reasonable in light of the facts and circumstances confronting them, which we determine by balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." (internal quotation marks and citations omitted)).  Here, a reasonable jury could conclude from the evidence on summary judgment that the officers *should have* known that Jontell was mentally ill. Thus, consideration of this factor weighs in favor of a finding that defendants acted unreasonably.

v.   Conclusion as to Government Interest

After weighing all of the relevant factors under the evidence presented on summary judgment, the court concludes that, viewing the evidence in the light most favorable to plaintiffs, a reasonable jury could determine that officers Clinton and Valencia used excessive force and thereby violated Jontell's constitutional rights.  The court therefore turns to the second prong of the qualified-immunity analysis.

2. <u>Whether Defendants Violated a Clearly Established Right</u>

A constitutional right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Young*, 655 F.3d at 1167 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "In determining whether the law has been clearly established, there does not need to be 'a case directly on point, but existing precedent must have placed the constitutional question beyond debate.'" *Vos*, 892 F.3d at 1035 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 740 (2011)); *see also Mullenix v. Luna*, 577 U.S. 7, 12 (2015); *A. K. H.*, 837 F.3d at 1013. Rather, "the relevant inquiry is whether the state of the law at the time of the official conduct complained of was such as to give the defendants fair warning that their conduct was unconstitutional—that a fair application of well-established legal principles would warrant such a conclusion." *Young*, 655 F.3d at 1167; *see also Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) ("The proper inquiry focuses on ... whether the state of the law [at the relevant time] gave 'fair warning' to the officials that their conduct was unconstitutional." (*quoting Saucier*, 533 U.S. at 202). The plaintiffs bear the burden of showing that the right in question was clearly established at the time. *Vos*, 892 F.3d at 1035. Thus, unless officers Clinton and Valencia obviously violated Jontell's constitutional rights, there must be "a case where an officer acting under similar circumstances as [Clinton and Valencia] was held to have violated the Fourth Amendment." *White v. Pauly*, ___ U.S. ___, 137 S. Ct. 548, 552 (2017).

Plaintiffs strenuously argue that granting summary judgment in favor of defendants on qualified immunity grounds is inappropriate where, as here, there is a genuine dispute of material facts. (Doc. No. 36 at 27.) However, as defendants point out, (Doc. No. 40 at 13), qualified immunity may still be appropriate despite a genuine dispute of material fact if, even viewing the evidence in the light most favorable to plaintiffs, defendants are still entitled to qualified immunity under the applicable legal standards. *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 945 (9th Cir. 2017).

Viewing the evidence on summary judgment in this case in the light most favorable to plaintiffs, Jontell was mentally ill, had recently been fighting with police officers, had disarmed one of them of his baton, was moving away from the officers, and was not threatening them. He

1   was shot without warning, resulting in his death.  This occurred outside, in public, and in

2   proximity to a city street with cars passing by.  Nonetheless, under binding precedent, to avoid the

3   granting of summary judgment in favor of defendants on qualified immunity grounds, plaintiffs

4   must establish that officers Clinton and Valencia had fair warning that shooting Jontell was

5   unconstitutional under these circumstances.  The Ninth Circuit's decision in *Lam v. City of Los

6   Banos*, 976 F.3d 986 (9th Cir. 2020) ("*Lam II*"), is instructive in making the determination of

7   whether plaintiffs have met that burden here.

8          In *Lam II*, in September 2013,[13] officer Acosta was called to Lam's home to investigate a

9   possible assault and found Lam in his room.  *Lam II*, 976 F.3d at 992.  Lam, who was mentally

10  ill, yelled at officer Acosta and told him to leave the room.  *Id.*  Acosta tried to get Lam to leave

11  the room with him, but Lam was uncooperative; he made punching motions through the air and

12  pushed Acosta out of his room.  *Id.*  Lam then grabbed a pair of scissors, which officer Acosta

13  stated he believed was a knife, and stabbed Acosta with them.  *Id.* at 991–92.  Acosta then shot

14  Lam once and retreated down the hall to unjam his gun.  *Id.* at 992.  Lam approached Acosta

15  again but was not holding scissors at this point.  *Id.* at 995.  Nonetheless, Acosta shot a second

16  time, and Lam died of his wounds.  *Id.* at 991, 995.  At trial, the jury found that officer Acosta's

17  firing of the second shot constituted the excessive use of force.  *Id.* at 994.  On appeal, the Ninth

18  Circuit determined that the law was clearly established that an officer may not shoot a previously

19  armed person who was no longer posing a threat and, therefore, that officer Acosta was not

20  entitled to qualified immunity with respect to his firing of the fatal second shot.  *Id.* at 999–1000.

21  Among other reasons, the Ninth Circuit observed "[a]t the time of the incident, caselaw had made

22  clear that an officer violates the Fourth Amendment by shooting a person who had previously

23  injured someone but no longer posed an immediate threat."  *Id.* at 1001.

24          *Lam II* is analogous to this case in many respects.  First, both Lam and Jontell were

25  mentally ill, and police officers were responding to calls regarding their allegedly violent

26  ───────────────────

27  [13]  The Ninth Circuit's opinion does not make it clear when the shooting occurred, but an order
    issued in the case by the district court stated that it took place on September 2, 2013.  *Lam v. City
    of Los Banos*, No. 2:15-cv-00531-MCE-KJN, 2017 WL 1179136, at *1 (E.D. Cal. Mar. 30,

28  2017).

behavior.  Both suspects initially fought the police officers.  A reasonable jury did (or could in this case) conclude that at the relevant time, neither Lam nor Jontell posed a threat to the officers or to others.  Although in *Lam II* the Ninth Circuit focused substantially on the fact that Lam was unarmed when he was shot the second time, it was undisputed that Lam approached officer Acosta before the second shot was fired.  Similarly, based upon the evidence on summary judgment here, a reasonable jury could conclude that Jontell was not carrying the baton in a threatening manner and was trying to move away from the officers when he was shot.

Thus, the facts in *Lam II* are quite similar to those presented by the evidence before the court in this case, except that Lam was unarmed and approaching the officer while Jontell was armed with the officer's baton but moving away from the officers.  The Ninth Circuit has repeatedly held that a person merely possessing a deadly weapon—assuming, for present purposes, that a baton is such a weapon—is not an open invitation for police officers to use deadly force.  *See, e.g., Roderick*, 126 F.3d at 1204 ("Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed."); *Glenn*, 673 F.3d at 873 (where a mentally ill suspect was armed with knife "which he did not brandish at anyone, but rather held to his own neck," it was clearly established that the use of deadly force by police was impermissible); *George v. Morris*, 736 F.3d 829, 838–39 (9th Cir. 2013) ("[T]he fact that the suspect was armed with a deadly weapon does not render the officers' response [of using deadly force] *per se* reasonable under the Fourth Amendment." (internal quotation marks and citation omitted)).  Accordingly, even though the facts in *Lam* were not identical to those before the court in this case, they are sufficiently analogous to be instructive.

Lam's rights were clearly established when he was shot in 2013, but the Ninth Circuit issued its opinion in 2020.  Meanwhile, Jontell was shot in 2018—between the time of Lam's death and the issuance of the Ninth Circuit's opinion in *Lam*.  The court in *Lam II* addressed this issue.  The Ninth Circuit in *Lam II* relied heavily on the decision in *Zion v. County of Orange*, 874 F.3d 1072 (9th Cir. 2017), which dealt with a police shooting that took place around the time Lam was killed.  In *Zion*, the Ninth Circuit had found that the decedent's rights were clearly

established when he was shot.  Given the factual similarities between *Zion* and *Lam II*, the Ninth

Circuit found that Lam's rights were clearly established at the time of his shooting as well.  *Lam*

*II*, 976 F.3d at 1002 ("Thus, although *Zion* had not been decided before this shooting, the events

underlying our decision in *Zion* occurred in the same timeframe as the events at issue here, and so

it is relevant as to what a reasonable officer would have known was unlawful at the time [Lam]

was shot.").  The same logic applies here.  If Lam's right to be free from the excessive use of

force under the circumstances of that case were clearly established in 2013, then so too was

Jontell's in 2018 under the facts that a reasonable jury could find based upon the evidence in this

case.

        This conclusion is also bolstered by the Ninth Circuit's opinion in *Newmaker,* another

police shooting resulting in the death of the suspect.  842 F.3d at 1110.  At midnight on the

morning of the shooting, Newmaker encountered officer Soeth, who believed Newmaker was

either mentally ill or on drugs based on his strange behavior.  *Id.* at 1111.  At 6 a.m., Soeth

responded to a call about a man—who might have been Newmaker—banging on the doors and

windows of a house.  *Id.*  Soeth located Newmaker, who fled from the officer.  *Id.*  Officer Soeth

eventually caught up, but Newmaker refused to comply with his commands to lay on the ground

and so Soeth physically brought him to the ground.  *Id.*  Officer Soeth eventually used a taser

multiple times on Newmaker, but the tasings were ineffective.  *Id.* at 1111–12.  A second police

officer then arrived and attempted to subdue Newmaker as officer Soeth took out his baton and

used it on Newmaker.  *Id.* at 1112.  According to the officers, Newmaker was then able to grab

Soeth's baton and swung it violently and aggressively at the second officer's head.  *Id.*  Soeth

shot Newmaker after ordering him to drop the baton.  *Id.*  Then, according to officer Soeth, he

shot Newmaker a second time "as he was getting up and starting to swing the baton again."  *Id.*

Newmaker died from the gunshot wounds.  The district court, relying on this evidence, granted

summary judgment in favor of the defendant officers on qualified immunity grounds.

        On appeal, the Ninth Circuit reversed the grant of summary judgment, noting that a

number of disputed issues of material fact had been established by the plaintiff.  *Id.* at 1110.

Three are particularly relevant here.  First, officer Soeth had previously provided a police

investigator a conflicting version of the events, including about whether Newmaker was standing up when Soeth shot him. *Id.* at 1113–14. Second, a grainy video from the second officer's dashcam was inconsistent with the officers' statements regarding what had occurred. Among other things, the video did not show that Newmaker ever obtained officer Soeth's baton. Although Newmaker and the officers were not in clear sight of the video at some critical points in time, the video evidence reflected "nothing clearly visible" in Newmaker's hands just before the shooting. *Id* at 1115. Third, and perhaps most critically, "Soeth appear[ed] to shoot" Newmaker after Newmaker fell to the street. *Id.* Finally, the autopsy report concluded that Newmaker was not standing when he was shot. *Id.*

Among other reasons that the granting of summary judgment on qualified immunity grounds was found to be inappropriate, the Ninth Circuit found that "a reasonable jury could conclude, given the trajectory of the bullets through Newmaker's body, that even if Newmaker had grabbed the baton Officer Soeth could not have fired his first shot while Newmaker was standing up and swinging the baton." *Id.* at 1116. The Ninth Circuit concluded that "[b]ecause this case requires a jury to sift through disputed factual contentions—including whether the officers were telling the truth about when, why, and how Soeth shot Newmaker—summary judgment was inappropriate." *Id.* at 1117 (internal quotation marks and citation omitted).[14]

*Newmaker* parallels the present case in many respects. Officers attempted to use tasers on the decedent in both cases several times and physically tussled with them before shooting them to death. The video evidence in *Newmaker* was grainy and did not show many critical details of the confrontation. Here, too, the video evidence is grainy and does not show many critical aspects of the encounter. For instance, just as "nothing [was] clearly visible" in Newmaker's hands when police claimed he was holding a baton, *id.*at 1115, here, it is not clearly depicted in the video that Jontell's hands were over his head wielding a baton before he was shot, as the defendant officers

---

[14]  In so concluding the Ninth Circuit also stated: "We hold that the district court erred in granting qualified immunity to Officer Soeth. Summary judgment is not appropriate in § 1983 deadly force cases that turn on the officer's credibility that is genuinely in doubt." 842 F.3d at 1116 (citing *Gonzalez v. City of Anaheim*, 747 F.3d 789, 791 (9th Cir. 2014), *C.V. v. City of Anaheim*, 823 F.3d 1252, 1256 (9th Cir. 2016), *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994), and *Wilson v. City of Des Moines*, 293 F.3d 447, 454 (8th Cir. 2002).

contend was the case.  In *Newmaker*, the video evidence was inconsistent with the officers' testimony that Newmaker was standing up and attacking them with a baton when he was shot the second time.  Here, the video evidence before the court on summary judgment appears to be inconsistent with defendants' claims that Jontell was still moving forward toward the officers after he was shot the first time.  In *Newmaker,* the Ninth Circuit found that even assuming the decedent was holding a baton, a reasonable jury could conclude from the evidence submitted that he was on the ground when he was shot.  *Id.* at 1116.  Similarly, here, a reasonable jury could conclude from the evidence before the court on summary judgment that Jontell was moving away from the officers when he was shot.

Accordingly, viewing the evidence facts in the light most favorable to plaintiffs defendants are not entitled to summary judgment in their favor on qualified immunity grounds.[15]

**B.  Fourteenth Amendment Claims**

In the Ninth Circuit, parents have substantive due process rights to associate with their children.  *Porter v. Osborn*, 546 F.3d 1131, 1136 (9th Cir. 2008).  "To prevail on a substantive due process claim under the Fourteenth Amendment, [p]laintiffs must show that [defendants'] conduct shocks the conscience."  *Nicholson*, 935 F.3d at 692.  A police officer can violate this right if the officer acts with either (1) deliberate indifference or (2) a purpose to harm unrelated to legitimate law enforcement objections.  *Porter*, at 1137 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 836 (1998)).

"Deliberate indifference is the conscious or reckless disregard of the consequences of one's acts or omissions.  It entails something more than negligence but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."  *Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013).  However, this standard

---

[15]  The undersigned has previously endorsed the now widely-held view that the judicially created qualified immunity doctrine should be completely re-examined, particularly in cases involving the use of deadly force by law enforcement officers.  *Ventura v. Rutledge*, 398 F. Supp. 3d 682, 697 n.6 (E.D. Cal. 2019) (granting defendant's motion for summary judgment on qualified immunity grounds), *aff'd* 978 F.3d 1088 (9th Cir. 2020).  Given the evidence on summary judgment in this case and for the reasons explained above, binding precedent dictates that defendants' motion brought on qualified immunity grounds be denied.

1    is relevant only if actual deliberation is practical. *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th

2    Cir. 2010). If law enforcement officers are in an escalating situation and must make snap

3    judgments, then the heightened purpose-to-harm standard applies. *Id.* The purpose-to-harm

4    standard requires proof of ulterior motives for the use of force. *Gonzalez v. City of Anaheim*, 747

5    F.3d 789, 797-98 (9th Cir. 2014) ("Where, as here, the officers did not have time to deliberate, a

6    use of force shocks the conscience only if the officers had a 'purpose to harm' the decedent for

7    reasons unrelated to legitimate law enforcement objectives.").

8       Plaintiffs argue that the first standard—deliberate indifference—applies to their

9    Fourteenth Amendment claim in this case. (Doc. Nos. 36 at 29–30; 37 at 18–19.) Here, the key

10    interaction—between the time Jontell seized officer Valencia's baton and the time officers

11    Clinton and Valencia shot Jontell—took place over the span of seconds. Such circumstances are

12    similar to those confronted by the court in *Lam*, where the officer had insufficient time to

13    deliberate before shooting Lam the second time, and which compelled the Ninth Circuit "to

14    conclude that actual deliberation sufficient for [the officer] to develop a purpose to harm

15    unrelated to a legitimate law enforcement objective was not practical before [the officer] shot

16    Sonny the second time." 976 F.3d at 1003; *see also Nehad*, 929 F.3d at 1139 (applying the

17    purpose to harm standard where there was "some evidence that a suspect posed no danger" but

18    where there was "no evidence that [the officer] fired on [the suspect] for any other purpose than

19    self-defense, notwithstanding the evidence that the use of force was unreasonable"). Likewise,

20    here officers Clinton and Valencia did not have sufficient time to deliberate in the context of their

21    escalating fight with Jontell before using deadly force. Accordingly, the deliberate indifference

22    standard does not apply to plaintiffs' Fourteenth Amendment claim. *See Wilkinson*, 610 F.3d at

23    554.

24       Defendants argue the purpose to harm standard applies and that there is no evidence

25    before the court establishing that defendant officers Clinton or Valencia had any motive other

26    than to stop Jontell. (Doc. No. 33 at 20–21.) Defendants point out that the officers had used

27    lesser means of force and applied deadly force only after Jontell seized an officer's baton. (*Id.*)

28    Neither plaintiff cites to evidence presented on summary judgment establishing any ulterior

1    motive on the part of the officers, and plaintiff Harris does not even discuss the standard, or

2    evidence relating to it, in her opposition.  *See Gonzalez*, 747 F.3d at 798 (holding that to establish

3    a purpose to harm, a plaintiff must make showing of ulterior motive).

4           Plaintiff Reedom argues that whether officers Clinton and Valencia acted with a purpose

5    to harm Jontell is a question of fact that should be left to a jury to resolve.  (Doc. No. 37 at 17–

6    18.)  At summary judgment, the court must determine whether a reasonable jury could determine

7    that officers Clinton and Valencia had a purpose to harm Jontell.  Plaintiff Reedom points to no

8    evidence or argument in this regard, other than citing to cases providing the general standard

9    applicable to determining whether a purpose to harm has been established.  (*See id.*).  This is not

10   sufficient to satisfy plaintiff Reedom's burden at summary judgment because "there is no issue

11   for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a

12   verdict for that party."  *Anderson*, 477 U.S. at 249.

13          Accordingly, the court will grant summary judgment in favor of defendants as to

14   plaintiffs' Fourteenth Amendment claims.

15   **C.      Plaintiffs' State-Law Claims**

16          Defendants also seek summary adjudication in their favor as to plaintiffs' state-law

17   claims.  (Doc. No. 33 at 23–24.)  In this regard, plaintiffs have brought claims for battery and

18   negligence, each related to Jontell's allegedly wrongful death, as well as a claim under

19   California's Bane Act.  (Doc. No. 28 at 17–22.)

20                  1.   Battery and Negligence

21          The traditional elements of a negligence-based claim are "duty, breach of duty, causation,

22   and damages."  *Marlene F. v. Affiliated Psychiatric Med. Clinic, Inc.*, 48 Cal. 3d 583, 588

23   (1989).  Under California law, officers have a duty to use reasonable care in employing excessive

24   force.  *Hayes v. Cty. of San Diego*, 57 Cal. 4th 622, 629 (2013).  The reasonableness of an

25   officer's actions is evaluated in light of the totality of circumstances, *id.*, and "must be judged

26   from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

27   hindsight," *id.* at 632 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  The standard for

28   negligence under California law is "broader than federal Fourth Amendment law" because it

1   includes consideration of an officer's conduct prior to moment when force is applied. *Id*. at 632,

2   639; *accord Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1125 (9th Cir. 2021) ("Under

3   California law, the officer's pre-shooting decisions can render his behavior unreasonable under

4   the totality of the circumstances, even if his use of deadly force at the moment of shooting might

5   be reasonable in isolation.").

6        Defendants first argue that they are entitled to summary adjudication as to plaintiffs' state

7   law claims because they are also entitled to summary judgment as to plaintiffs' excessive use of

8   force claims. (Doc. No. 33 at 23–24.) Here, as discussed in detail above, the court has

9   determined that there is a genuine dispute of material fact as to whether officers Clinton and

10  Valencia used excessive force in violation of the constitution. Accordingly, a reasonable jury

11  could also determine that officer Clinton's and officer Valencia's pre-shooting decisions rendered

12  their behavior unreasonable under the totality of the circumstances. For instance, a reasonable

13  jury could be convinced by the expert opinion of witness Clark that officers Clinton and Valencia

14  "had the opportunity to de-escalate the situation. Instead, the officers acted contrary to police

15  practices and training by using more force and escalating the situation, including the use of the

16  Taser, pepper spray, and baton strikes," (Doc. No. 34-5 ¶ 12), or that their "use of deadly force

17  against [Jontell] violated standard police practices, training, and POST standards on the use of

18  deadly force only in an immediate defense of life situation and only when all other reasonable

19  alternatives are unavailable," (*id.* ¶ 18). In addition, as plaintiff Harris argues, qualified immunity

20  is not a defense to these state-law claims. *Venegas v. Cty. of Los Angeles*, 153 Cal. App. 4th

21  1230, 1243 (2007) ("The doctrine of qualified governmental immunity is a federal doctrine that

22  does not extend to state tort claims against government employees."). Therefore, defendants are

23  not entitled to summary judgment in their favor as to plaintiffs' state-law claims.

24        2. Bane Act

25        Plaintiffs have also brought a claim under the Bane Act, California Civil Code § 52.1.

26  Defendants argue they are entitled to summary adjudication in their favor as to this claim because

27  plaintiffs have failed to present evidence proving that defendants Clinton or Valencia had a

28  specific intent to violate Jontell's rights. (Doc. No. 33 at 24.)

1          The Bane Act gives rise to a claim when "a person . . . whether or not acting under the

2    color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat,

3    intimidation, or coercion" with a right secured by federal or state law.  Cal. Civ. Code § 52.1(a).

4    Civil damages are available for violations of the Bane Act.  *Id.* § 52.1(b).  However, to hold an

5    officer liable for the excessive use of force, a plaintiff must prove the officer had a specific intent

6    to violate that person's right to freedom from unreasonable seizure.  *Reese v. Cnty. of*

7    *Sacramento*, 888 F.3d 1030, 1043–44 (9th Cir. 2018).  A specific intent can be proved by

8    showing a reckless disregard for such rights.  *Id.*  Qualified immunity is not a defense to a claim

9    brought under California's Bane Act.  *Id.* at 1040–41.

10         Defendants argue that "the undisputed evidence shows that the intent of Officers Clinton

11   and Valencia was to defend themselves and others from a reasonable perception that [Jontell]

12   posed an immediate and ongoing threat to the officers and others," and thus they did not act with

13   a specific intent to deprive Jontell of his constitutional rights.  (Doc. No. 33 at 24.)  Plaintiff

14   Harris argues that a reasonable jury could conclude from the evidence that officers Clinton and

15   Valencia acted with a reckless disregard for Jontell's rights, as evidenced by Jontell's attempts to

16   disengage from officers Clinton and Valencia, and the defendants' use, nonetheless, of increasing

17   amounts of unreasonable force.  (Doc. No. 36 at 31.)

18         At the outset, there is a genuine disputed issue of material fact in this case as to whether

19   officers Clinton and Valencia had a reasonable perception that Jontell posed an immediate and

20   ongoing threat to them or to others.  Moreover, if a jury were to conclude that Jontell did not have

21   the baton raised above his head and were to also determine that officers Clinton and Valencia

22   were sufficiently far away from him when he was shot, the jury could also reasonably conclude

23   that officers Clinton and Valencia acted in reckless disregard of Jontell's constitutional rights.

24   Therefore, the court concludes that defendants are not entitled to summary judgment in their favor

25   with respect to plaintiffs' Bane Act claim.

26   /////

27   /////

28   /////

**CONCLUSION**

For the reasons discussed above:

1.  Defendants' motion for summary judgment (Doc. No. 33) IS GRANTED IN PART and DENIED IN PART;

2.  Pursuant to the parties' May 19, 2021 stipulation of dismissal (Doc. No. 57), plaintiffs' claims against defendant City of Tulare are dismissed, and defendant City of Tulare is dismissed from this action;

3.  Summary judgment is granted in favor of defendants as to plaintiffs' Fourteenth Amendment claims brought under 42 U.S.C. § 1983;

4.  Defendants' motion for summary judgment is otherwise denied;

5.  The Clerk of the Court is directed to now reassign this case to U.S. District Judge Jennifer L. Thurston and to remove the "NONE" designation; and

6.  This matter is set for a trial setting conference before Judge Thurston on March 11, 2022 at 1:30 p.m.

IT IS SO ORDERED.

Dated:   __**January 21, 2022**__          _____
                                                            UNITED STATES DISTRICT JUDGE